# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:12cr93

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| v. | ) | |
| | ) | |
| LLOYD DODWELL and | ) | |
| DARREN HILL, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant Lloyd Dodwell's Motion to Suppress (# 33), and Defendant Darren Hill's Motion to Suppress (#18) and Amended Motion to Suppress (#19). The Grand Jury charged Defendants with knowingly and intentionally possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Subsequently, Defendants both moved to suppress evidence found as a result of a traffic stop.[1] After the Government responded to the pending motions, the Court conducted a hearing and heard evidence from the Government and Defendants, as well as the arguments of counsel. Having carefully considered the evidence in the record, the parties'

_____

1 Defendants consent to having the Motions to Suppress heard jointly.

briefs, and the arguments of counsel, the Court **RECOMMENDS** that the District Court **DENY** the Motions to Suppress (# 18, # 19, # 33).

## I.     Factual Background

### A.     Deputy David Lee McMurray, Jr.

#### 1.  background and training

At the hearing, the Government called Deputy David Lee McMurray, Jr. as a witness.  Deputy McMurray is a deputy and canine handler with the Henderson County Sheriff's Office, where he has been employed since February 2009.  (T. pp. 7-12.)  Prior to his employment with the Henderson County's Sheriff's Office, Deputy McMurray was a road trooper and canine handler with the North Carolina Highway Patrol for approximately nine years.  (T. pp. 9-12.)  During the relevant time period, Deputy McMurray was assigned to the Criminal Interdiction Team of a joint task force between the Henderson County Sheriff's Office and the Buncombe County Sheriff's Office.  (T. pp. 7-8.)

Deputy McMurray was working with a Belgium Malinois canine named Kira at the time of the traffic stop at issue.  (T. pp. 12-13.)  Kira is a passive alert dog; she alerts to the presence of narcotics by making a noticeable change of behavior such as a head turn.  (T. pp. 60, 87, 164, 195-196.)  Her final indication is to stare directly at the source of the odor of narcotics.  (T. 60, 64-65, 86-88, 195-

96.)

Deputy McMurray has been a canine handler since 2006, and he was first trained with Kira as a narcotics team in 2010. (T. pp. 12-14.) The training for Kira was initially through Shallow Creek Kennels in Sharpsville, PA. (T. pp. 14-15.) Deputy McMurray and Kira then trained together for a week and were certified by the North American Police Work Dog Association on September 1, 2010. (T. p. 15; Gov.'s Ex. 1.) Deputy McMurray and Kira were recertified on July 14, 2011, (T. pp. 11-16; Gov.'s Ex. 2) and July 19, 2012 (T. pp. 15-16; Gov.'s Ex. 3). These certificates show that Deputy McMurray and Kira received accreditation as a "Narcotics Detection Team: Marijuana, Cocaine, Heroin, and Methamphetamine." (Gov.'s Ex.1; Gov.'s Ex. 2; Gov.'s Ex. 3.)

During the original accreditation in 2010 and the annual reaccreditations in 2011 and 2012, Deputy McMurray and Kira participated in testing in order to determine if they could locate hidden marijuana, cocaine, heroin, and methamphetamine in three different environments: a building, a vehicle, and a locker. (T. pp. 19-28; Gov.'s Ex 1; Gov.'s Ex. 2; Gov.'s Ex. 3.) During these tests, "conflict odors" such as food, chemicals, toys, urine, trash, cat odors, and other distracting odors were used to attempt to confuse or divert Kira. (T. p. 175; Gov.'s Ex. 1; Gov.'s Ex. 2; Gov.'s Ex. 3.) Kira successfully completed all the

original accreditation tests and all recertification tests.  (T. pp. 19-28; Gov.'s Ex. 1, Gov.'s Ex. 2; Gov.'s Ex. 3.)

In addition to the accreditation and reaccreditation tests, Deputy McMurray performed additional training with Kira, which he documented in written reports. (T. pp. 29-30; Gov.'s Ex. 4.)  Although Deputy McMurray typically trained Kira sixteen hours per month, he did not train her for the three months prior to the traffic stop at issue because Deputy McMurray had undergone cervical spine surgery.  (T. p. 120.)   Deputy McMurray, however, did not believe that it was necessary to train Kira during his recovery period because Kira was such a seasoned narcotics dog.  (T. p. 121.)

Deputy McMurray also documented each deployment he made with Kira. This documentation included the reason for the deployment and what, if anything, was found as a result of the deployment.  (T. pp. 29-30; Gov.'s Ex. 4.)  The Government's Exhibit 4 reflects the following results from the deployment and subsequent search of vehicles between September 2010 and May 2012:

September 2010:   Obedience Training ("O.T.:):  5 sessions
                  Drug Training ("D.T."):  3 sessions

                  Deployments: September 22 – sniffed tractor trailer.  McMurray saw change in behavior of Kira but no final indication.  No drugs were found. Driver subject to several open narcotics

investigations.

Two other deployments showed no alert or indications, and hand search revealed no drugs.

October 2010:     O.T.:  4 sessions
                  D.T.:  3 sessions

Deployments: October 1 – Kira alerted to the odor of narcotics and performed final indication at a gasoline fill cap.  Hand search revealed compartments in vehicle with a trap door that had been constructed.  During hand search no drugs were found.  Vehicle had been purchased four days before the search.

October 4 – Kira alerted, but gave no final indication.  The tractor and trailer had fabricated compartments.  Hand search showed no drugs.

Nine other deployments showed no alerts or indications.  Hand searches showed no narcotics.

November 2010:    O.T.:  8 sessions
                  D.T.:  2 sessions

Deployments: November 1 – Deputy McMurray saw noticeable change in behavior in Kira, who made several attempts to jump through a driver's side window.  Kira did not give a final indication. There was a cat in the backseat.  Hand search revealed no narcotics.

Seven other deployments showed no alerts or indications.  Hand searches showed no narcotics.

December 2010:    O.T.:  7 sessions
                  D.T.:  2 sessions

Deployments:  December 14 –Kira alerted and gave her final indication.  Hand search revealed 150 lbs. of marijuana.

January 2011:     O.T.:  8 sessions
                  D.T.:  2 sessions

                  Deployments:  none

February 2011:    O.T.:  2 sessions
                  D.T.:  4 sessions

                  Deployments: February 6 – Kira alerted and gave her final indication.  Hand search revealed 3,945 lbs. of marijuana.

                  February 15 - Kira alerted but gave no final indication.  Hand search revealed evidence of trailer housing being taken apart.  No drugs were found.

                  One other deployment showed no alert or final Indication.  Hand search revealed no narcotics.

March 2011:       O.T.:  4 sessions
                  D.T.:  3 sessions

                  Deployments: March 19 – Kira alerted and gave final indication.   Hand search revealed 28 grams of marijuana.

                  March 22 – Kira alerted and gave final indication.  Hand  search revealed 680 grams of cocaine.

                  Nine other deployments showed no alert or final indication.  Hand search found no narcotics.

| | |
|---|---|
| April 2011: | O.T.:  12 sessions |
| | D.T.:  2 sessions |

Deployments:  during four deployments, Kira showed no alerts or final indications.  Hand searches found no narcotics.

| | |
|---|---|
| May 2011: | O.T.:  8 sessions |
| | D.T.:  1 session |

Deployments:  during three deployments, Kira showed no alerts or final indications.  Hand searches revealed no narcotics.

| | |
|---|---|
| June 2011: | O.T.:  6 sessions |
| | D.T.:  2 sessions |

Deployments: during three deployments, Kira showed no alerts or final indications.  Hand search revealed no narcotics.

| | |
|---|---|
| July 2011: | O.T.: 6 sessions |
| | D.T.: 1 session |

Deployments:  during four deployments, Kira showed no alerts or final indications.  Hand search revealed no narcotics.

| | |
|---|---|
| August 2011: | O.T.:  6 sessions |
| | D.T.:  1 session |

Deployments:  August 11 – Kira alerted and gave final indication.  Hand search revealed 209 lbs. of marijuana.

One other deployment where Kira did not alert or show final indication.  Hand search revealed no narcotics.

September 2011:   O.T.:  6 sessions
                  D.T.: 1 session

                  Deployments: none

October 2011 :    O.T.:  5 sessions
                  D.T.:  2 sessions

                  Deployments -none

November 2011:    O.T.:  6 sessions
                  D.T.:  0 sessions

                  Deployments:  during three deployments Kira did
                  not alert or show final indication.  Hand search
                  revealed no narcotics.

December 2011:    O.T.:  6 sessions
                  D.T.:  1 session

                  Deployments:  during four deployments, Kira did
                  not alert or show final indication.  Hand search
                  revealed no narcotics.

January 2012:     O.T.:  0 sessions
                  D.T.:  3 sessions

                  Deployments:  January 24 – Kira alerted and gave
                  final indication.  Hand search revealed 4.72 grams
                  of marijuana.

                  During seven other deployments Kira did not alert
                  or show final indication.   Hand searches revealed
                  no narcotics.

February 2012 :   O.T.:  0 sessions
                  D.T.:  0 sessions

Deployments: no deployments because Deputy McMurray was out for neck surgery.

March 2012:    O.T.: 0 sessions
               D.T.: 0 sessions

               Deployments: no deployments because Deputy McMurray was out for neck surgery.

April 2012 :   O.T.: 0 sessions
               D.T.: 0 sessions

               Deployments: no deployments because Deputy McMurray was out for neck surgery.

May 2012:      O.T.: 0 sessions
               D.T.: 2 sessions

               Deployments: May 2 – Kira alerted to the vehicle operated by Dodwell in which Hill was riding as a passenger.

Defendant Dodwell introduced into evidence as Defendant's Exhibit 4 a copy of the Henderson County, North Carolina Sheriff's Office Guidelines for Deployment and Utilization of Canine Units. In regard to canine training, the guidelines state:

**C.    Unit Certification and Training**

1.    Certification

a.    All Canines owned or leased by the Sheriff's Office must meet established department certification requirements.

b.      Before a Canine will be authorized by the Sheriff's Office for use for law enforcement activities, the Canine Team (Handler and Canine) shall obtain certification from a nationally recognized police canine certification body, to be approved by the Sheriff.

c.      Additional certifications, such as from the North Carolina Police Dog Association, may be used to supplement the requirements of section b with the approval of the Sheriff.

d.      Specialty Canines, such as explosives or narcotics Canines and Bloodhounds will be trained and certified, if applicable, by a certifying organization approved by the Sheriff.

e.      The certifications for all Canines shall be in the specific area(s) of activity for which the Canine will be used.

f.      The Handler shall not use any Canine for any function for which the Handler and the Canine have not been properly trained and certified.

g.      The Handler shall be responsible for maintaining the current certification of each Canine assigned to to him as required by the national certifying body by which each such Canine is certified and shall properly document the certification(s) and shall forward a copy of the certification(s) to the Canine Supervisor and Patrol Captain to be maintained in the Canine's file.

h.      Any Canine Team which fails to maintain the certification and training standards set forth in this policy shall be immediately removed from duty

until the Canine regains certification or is other-
wise approved for duty by the Sheriff.

2.     In-Service Training

 a.     A minimum of 16 hours of training per month will
be required to comply with Sheriff's Office
requirements for in-service training.

 b.     Each utilization or in-service training event of
Canines will be documented on the "Canine Arrest
and Utilization Report" (Attachment A) or the
"Canine Training Log" (Attachment B).  A copy of
the report will be forwarded to the Canine
Supervisor and to the Patrol Captain at the end of
each shift.

(Def.'s Ex. 4.)

2.     the traffic stop of Defendants

On Wednesday, May 2, 2012, at 6:30 p.m. Deputy McMurray was on duty

in his patrol car with Kira.  (T. p. 32.)   While observing traffic on I-26, Deputy

McMurray noticed two vehicles traveling within a car length of distance between

them.  (T. 33.)  The vehicles were each traveling at a speed of approximately

60mph.  (T. p. 33.)  In the opinion of Deputy McMurray, the second vehicle was

following too closely and, thus, violating North Carolina law.  (T. pp. 34-35.)

From his experience and training, Deputy McMurray had  developed an opinion

that one vehicle should follow another no closer than one car length per 10 miles

per hour of speed. (T. pp 38, 128-129.) Accordingly, Deputy McMurray activated his blue light and attempted to stop the following vehicle, which was a Chevrolet Equinox. (T. p. 38.)

When Deputy McMurray activated the blue light, the audio and video equipment in the patrol car was automatically activated. (T. pp. 38, 135-136.) The video equipment shows a view over the hood of the patrol vehicle and into the interior of the patrol vehicle showing both the driver's seat and the front passenger seat of the patrol vehicle. (T. pp. 39, 135-136.) Audio equipment automatically begins recording on the outside of the patrol vehicle through a body microphone worn by Deputy McMurray. A microphone on the inside of the patrol vehicle is located in the driver's side door. (T. pp. 38-40, 83, 135-137.) Using these recording devices, Deputy McMurray attempted to record both video and audio of the stop, as well as the resulting investigation. (T. pp. 40-41; Gov.'s Ex. 5.)

After Deputy McMurray turned on his blue lights, the Equinox first attempted to stop beside a guardrail on the shoulder of the northbound lane of I-26. (Gov.'s Ex. 5.) Deputy McMurray, however, motioned for the operator of the vehicle to travel further on I-26 to a point where there was no guardrail near the shoulder of the road. (Gov.'s Ex. 5.) One minute and forty-six seconds after Deputy McMurray turned on his blue light, he left the patrol car and approached

the passenger side of the Equinox, whose passenger window was down. (T. p. 84.)

Defendant Dodwell was sitting in the driver's seat of the Equinox and Defendant Hill was sitting in the front passenger seat. (T. p. 44.) Deputy McMurray told Dodwell that he had stopped Dodwell because he was right on top of the vehicle he was following. In response, Dodwell admitted that he was following the vehicle too closely and explained that the vehicle he was following had been braking. (T. p. 46; Gov.'s Ex. 5 at 1:46.) Deputy McMurray then directed Dodwell to exit the Equinox and come back to Deputy McMurray's patrol car so that he could write Dodwell a warning ticket. (T. p. 45; Gov.'s Ex. 5 at 3:15.)

Upon exiting the Equinox, Deputy McMurray conducted a pat down of Dodwell to ensure he was not carrying a weapon. (Gov.'s Ex. 5 at 4:03.) Deputy McMurray then instructed Dodwell to get in the front seat of the patrol car; Deputy McMurray did not place Dodwell in handcuffs. (Gov.'s Ex. 5 at 4:10.) After both Deputy McMurray and Dodwell were seated in the patrol car, Deputy McMurray asked Dodwell where he was traveling; Dodwell responded that he was returning from Atlanta where he and Hill had visited with "Hill's sister's baby-daddy and son." (Gov.'s Ex. 5 at 4:37.) At this point in the conversation, Dodwell removed his hat and began rubbing his head, which indicated to Deputy McMurray that

Dodwell was under a lot of stress. (Gov.'s Ex. 5 at 5:28; T. p. 89.) Although Dodwell stated that he did not know anyone in Atlanta, he also told Deputy McMurray that he had stayed with friends while visiting Atlanta. (Gov.'s Ex. 5 at 5:49.) Dodwell, however, then explained that he had stayed with friends of Hill. (Gov.'s Ex. 5.) The fact that Dodwell could not tell Deputy McMurray where he had stayed in Atlanta, made Deputy McMurray suspicious that criminal activity was afoot. (T. p. 149.) In addition, Deputy McMurray was also concerned about the possibility of criminal activity because Atlanta is the largest source of narcotics on the east coast. (T. p. 148.)

While talking with Dodwell, Deputy McMurray also discovered that the Equinox was owned by a third party, but that Dodwell could not tell Deputy McMurray much about the owner; Dodwell could not readily find the paperwork for the vehicle either. (T. pp. 150-151.) Dodwell later explained that the Equinox was owned by Hill's girlfriend or sister. (Gov.'s Ex. 5 at 8:16.) In Deputy McMurray's experience, a third-party vehicle is often used by drug trafficking organizations because both the operator and the owner of the vehicle can disassociate themselves from anything found in the vehicle. (T. pp. 152-153.)

Upon further questioning, Deputy McMurray inquired whether Dodwell had been arrested in the past, and Dodwell responded that he had been arrested for

possession of crack cocaine and had served an active sentence of eight months. (Gov.'s Ex. 5 at 6:13 – 7:30.)  In response to questions concerning Defendant Hill, Dodwell later explained that Hill had also been arrested for drugs.  (Gov.'s Ex. 5 at 12:20.)  Dodwell also volunteered an explanation to Deputy McMurray as to why he was following the other vehicle so closely.  (Gov.'s Ex. 5 at 11:04.)  While talking to Dodwell, Deputy McMurray was simultaneously working on the computer located in his patrol car to further the traffic stop.  (Gov.'s Ex. 5.)

Thirteen minutes and thirty-seven seconds after Deputy McMurray first initiated his blue lights, he exited the patrol vehicle in order to obtain Hill's date of birth and to check the vehicle identification number of the Equinox.  (Gov.'s Ex. 5 at 13:37.)   Deputy McMurray left Dodwell sitting in the patrol vehicle.  (T. p. 50.)  In response to questioning by Deputy McMurray, Hill tells Deputy McMurray that he and Dodwell were traveling from Atlanta , where they had attended a professional  basketball game .  (T p. 50-51.)   In addition, Hill gave Deputy McMurray his date of birth.  (T. p. 51.)  Deputy McMurray, however, did not obtain the vehicle identification number for the Equinox because he did not want to be distracted from the discrepancies between the statements of Hill and Dodwell. (T. p. 91.)

After a few minutes, Deputy McMurray returned to his patrol vehicle.

(Gov.'s Ex. 5 at 15:18.)  Deputy McMurray then asked Dodwell if he had done anything special in Atlanta.   Dodwell responded that the only thing he had done was go to a mall; Dodwell denied going to a basketball game.  (T. p. 51; Gov.'s Ex. 5 at 15:53-6:10.)   At this point, Deputy McMurray became more suspicious of the Defendants.  (T. p. 52.)

Seventeen minutes and twenty-two seconds after Deputy McMurray initiated his blue lights, Deputy McMurray handed Defendant Dodwell a warning ticket and returned the vehicle documentation.  (T. pp. 129-135; Gov.'s Ex. 5 at 17:22.) Deputy McMurray then asked Dodwell if he would agree to continue talking with him, and Dodwell consented.  (Gov.'s Ex. 5 at 17:57.)  Deputy McMurray then explained to Dodwell that Hill was not telling him the same story as Dodwell. (Gov.'s Ex. 5 at 18:08.)  Deputy McMurray then asked Dodwell if there was cocaine or "weed" in the Equinox.  (Gov.'s Ex. 5 at 18:46.)  Dodwell stated that there was no cocaine or weed in the vehicle.  Deputy McMurray then explained to Dodwell that Hill told him that Dodwell and Hill had gone to an Atlanta Hawks game.  (Gov.'s Ex. 5 at 19:16.)   Dodwell, however, denied going to a game and stated that he stayed with his fiancée and children.  (Gov.'s Ex. 5 at 19:26.) Dodwell also stated that he was with Hill the entire time they were in Atlanta. (Gov.'s Ex. 5 at 19:30.)

Deputy McMurray then left his patrol car to talk to Hill again.[2] (Gov.'s Ex. 5 at 22:04.) Deputy McMurray asked Defendant Hill if he would consent to talk to him, and Hill consented. (T. p. 54.) Subsequently, Hill told Deputy McMurray that Dodwell did in fact go to a game with Hill. (T. 54-55.) Deputy McMurray then asked Hill for permission to search the Equinox, but Hill told Deputy McMurray that he should talk to Dodwell. (T. p. 55.)

After returning to his patrol car, Deputy McMurray told Dodwell that Hill told him that Dodwell was with Hill at the game. (Gov.'s Ex. 5 at 24:54.) Deputy McMurray also explained to Dodwell that he wanted to search the Equinox, and he asked for permission to do so. (Gov.'s Ex. 5 at 24:59.) Dodwell responded that he could not consent because he did not own the vehicle. (Gov.'s Ex. 5 at 26:55.)

Deputy McMurray then called over the radio for a deputy to come to the scene while he conducted a dog sniff of the Equinox. (Gov.'s Ex. 5 at 27:03.) Deputy McMurray told Dodwell that once the other deputy arrived, Deputy McMurray was going to run his dog around the Equinox. (Gov.'s Ex. 5 at 29:19-29:25.) Deputy McMurray further explained to Dodwell that if the dog alerted on the vehicle, then Deputy McMurray was going to search the vehicle; if the dog did not alert then Deputy McMurray was not going to search the vehicle. (Gov.'s Ex.

---

2   The conversation with Hill was not recorded because Deputy McMurray did not have his body microphone on his person.

5 at 29:19-29:25.)  Dodwell responded that was fine with him.  (Gov.'s Ex. 5 at 29:25-29:30.)

Several minutes later, another law enforcement officer arrived on the scene. (Gov.'s Ex. 5 at 33:07.)  At this point Deputy McMurray asked  Hill to get out of the Equinox, and Deputy McMurray performed a pat down of Hill to check for weapons.  (T. pp. 56-58; Gov.'s Ex. 5 at 34:10-34:16.)  After confirming that Hill was not carrying a weapon, Deputy McMurray directed Hill to go to a point in the grass behind the back bumper of the patrol vehicle, which was approximately 20 feet from the Equinox.  (T. pp. 14-15, 95.)

Once Hill was situated away from the Equinox, Deputy McMurray got Kira out of the patrol car and began to walk Kira on the leash around the Equinox vehicle.  (Gov.'s Ex. 5, 35:15.)  Kira, however, initially headed into the grass in Hill's direction.  (T. pp. 97-98; Gov.'s Ex. 5 at 35:20.)  Deputy McMurray pulled Kira's leash in order to redirect her to the  Equinox.  (Gov.'s Ex. 5 at 35:22.)   Kira then ducked her head to the passenger door of the Equinox.  (Gov.'s Ex. 5.)  As Kira came around the rear of the Equinox to the passenger side a second time, she turned  in the direction where Hill had previously walked and was currently standing.  (T. pp. 59, 61-62; Gov.'s Ex. 5 at 35:41.)  McMurray again redirected Kira back to the Equinox, where she looked  into the passenger window.  (Gov.'s

Ex. 5 at 35:42.)  At the time, Deputy McMurray did not recognize that Kira was alerting to Hill.  (T. pp. 64-65, 156-157.)

On each trip around the Equinox, Kira alerted to the passenger door area of the Equinox  vehicle.  (T. pp. 177-178.)  On the third time around the Equinox, Kira jumped into the vehicle through the passenger door window.  (Gov.'s Ex. 5 at 36:26.)  Deputy McMurray interpreted the actions of Kira as an alert to the presence of the odor of narcotics in the Equinox.   (T. pp. 63, 99, 198.) Accordingly, Deputy McMurray removed Kira from the Equinox, placed her back in the patrol car, and began searching the vehicle.  (T. p. 63; Gov's Ex. 5 at 36:46.)

While searching the Equinox, Deputy McMurray smelled the odor of burned marijuana.  (T. p. 74.)  In the front passenger floor board and underneath the front passenger seat, Deputy McMurray found bundles of United States currency totaling in excess of $30,000.  (T. p. 66.)  Based upon  his experience, Deputy McMurray believed that finding bundles of currency was consistent with the currency being proceeds from the drug trade.  (T. p. 67.)

After finding the currency, Deputy McMurray placed both Dodwell and Hill in handcuffs.  (T. p. 68; Gov.'s Ex.5 at 46:34.)  Deputy McMurray then placed Hill in the backseat of the patrol car, which was next to Kira's kennel.  (T. p. 68; Gov.'s Ex. 5 at 49:00.)   Deputy McMurray informed Dodwell that he was not under

arrest. (Gov.'s Ex. 5 at 48:01.) Deputy McMurray then called Task Force Officer Fred Westphal to come to the scene and seize the currency. (T. pp. 122-123.)

Once Deputy McMurray placed Hill in the patrol car beside Kira, she started pacing around the interior of the kennel. (Gov.'s Ex. 5 at 50:01.) Later, Kira started whining and staring at Hill, who was still sitting inside the patrol car next to Kira. (Gov.'s Ex. 5 at1:00:45.) After a period of time, Deputy McMurray asked Dodwell to get out of the patrol car, and he removed Dodwell's handcuffs. (Gov.'s Ex. 5 at 1:17:25.) Deputy McMurray then placed Hill in the front passenger seat of the patrol car. (Gov.'s Ex. 5 at 1:18:18.) A few minutes later, Hill began struggling back and forth in the passenger seat for approximately three minutes. (Gov.'s Ex. 5 at 1:26:38-1:29:38.) After several minutes of struggling, Hill produced a plastic bag containing a white substance from his backside, which he dropped behind the driver's seat of the patrol car. (Gov.'s Ex. 5 at 1:26:38-1:29:38.) Approximately twelve minutes later, Deputy McMurray removed Hill from the patrol car and placed Dodwell back in the patrol car with no handcuffs. (Gov.'s Ex. 5 at1:42:20.) After, the Detective Fred Westphal interviewed Dodwell and Hill, they were released. (T. p. 73.)

3. the events subsequent to the traffic stop

Later, at the Henderson County Sheriff's Office, Deputy McMurray

deployed Kira to see if she could detect the odor of narcotics from five separate parcels; four of which were empty, while one contained the currency seized from the Equinox. (T. pp. 75, 194-95.) Deputy McMurray did not know which parcel contained the seized currency. (T. p. 75.) Kira alerted to the parcel containing the seized currency. (T. p. 76.)

Approximately ten days after the traffic stop of Defendants, Deputy McMurray reviewed the video of the stop to aid him in drafting his report of the incident. (T. pp. 77, 167.) As he was reviewing the video, Deputy McMurray saw the portion of the video where Hill placed the bag behind the seat of the patrol vehicle. Deputy McMurray then went to his patrol vehicle and located the bag. Subsequently, Deputy McMurray contacted Task Force Officer Fred Westphal who came to Deputy McMurray's home and seized the bag. (T. pp. 69, 77, 214-15.) Detective Westphal transported the bag, which was later determined to contain cocaine, to the Henderson County's Sheriff's Office. (T. p. 215.)

**B.      Detective Fred Westphal**

The Government called Detective Westphal as a witness. (T. p. 200.) Detective Westphal is a senior investigator with the Henderson County Sheriff's Office and has worked as a task force officer for the Drug Enforcement Administration for three years and eleven months. (T. pp. 201-202.) On May 2,

2012, Detective Westphal went to the scene of the traffic stop at issue after receiving a call from Deputy McMurray. (T. pp. 203-204.) He arrived on the scene at approximately 7:00 p.m. while Deputy McMurray was in the process of searching the Equinox. (T. pp. 205, 219.) Detective Westphal testified that he could also smell the odor of burned marijuana emitting from the Equinox. (T. pp. 204, 216.) Detective Westphal also believed that Dodwell and Hill smelled of marijuana. (T. p. 17.)

Upon arriving on the scene, Detective Westphal advised Dodwell of his rights, pursuant to <u>Miranda v. Arizona</u>. (T. pp. 205-206.) After being advised of his <u>Miranda</u> rights, Dodwell agreed to speak to Detective Westphal, and Detective Westphal proceeded to question Dodwell as to the ownership of the currency. (T. pp. 205, 210.) Dodwell told Detective Westphal that he was unaware that the currency was in the Equinox until Hill received a telephone call from Hill's sister while both Dodwell and Hill were in Deputy McMurray's patrol car. (T. p. 210.) Detective Westphal, however, noted that during the time period when Dodwell stated Hill received a phone call, both Dodwell and Hill were in handcuffs with their hands behind them; they could not have operated a telephone at the time. (T. p. 211.)

Detective Westphal next interviewed Hill. (T. pp. 211-212.) After advising

Hill of his <u>Miranda</u> rights, Hill agreed to talk to Detective Westphal about the currency Deputy McMurray found in the Equinox.  (T. pp. 212-20.)  Although Hill first stated that the currency was not his, he subsequently stated that $5,000 was his, but the remainder belonged to his sisters.   (T. p. 213.)  Hill also told Detective Westphal that he had no idea when the currency had been placed in the vehicle but had learned of the presence of the currency after Dodwell received a telephone call from one of Hill's sisters.  (T. pp. 213-214.)

### C.    Steven Douglas Nicely

Defendants called Steven Douglas Nicely as an expert witness.  (T. p. 224.) Nicely works as a dog trainer and consultant  concerning the training of police dogs.  (T. p. 224.)  Nicely was a member of the United States Marine Corps Military Police from 1972 to 1979 and worked in law enforcement through 1986. (T. pp. 226-227.)   In 1989 Nicely began working with Global Training Academy, where he trained police officers and police dogs.  Nicely, however, has not worked in law enforcement since July of 1992.  (T. p. 285.)  In 2013, Nicely received an Associates Degree in psychology.  (T. p. 319-20.)

During the approximately fifteen years he worked for Global Training Academy, Nicely trained approximately 750 dogs and 400 dog handlers.  (T. pp. 227, 290.)   While working at Global Training Academy, Nicely no longer held

any certifications from the North American Police Working Dog Association or U.S.P.C.A. because based on his interactions with behavioral scientists, he was of the opinion that the training by those organizations was "stagnant." (T. pp. 293-295.) Although Nicely incorporates behavioral science into his work, this type of training is not in line with the bulk of training in the detection dog training world. (T. pp. 297-298.)

Nicely has testified approximately ninety times in state and federal courts as an expert witness on the topic of utilization of police dogs. (T. p. 229.) Nicely, however, has only testified for defendants, and has never provided testimony for law enforcement or a prosecutorial organization. (T. p. 296) [3]

Nicely is familiar with the North American Police Working Dog Association and its certification process for handlers and dogs. (T. pp. 230-31.) In his opinion a certification from this organization should have no validity because the organization does not conduct "double blind testing." (T. p. 235.) Nicely also reviewed the training records of Kira. (T. p. 236.) In his opinion, many of the records are incomplete (see e.g. T. 236-41.) Nicely, of course, was not present at any training or certification of Deputy McMurray and Kira. (T. p. 302.)

Nicely also examined the video of the stop and the search of the Equinox.

---

[3] Defendants tendered Nicely as an expert witness, and the Government did not object. (T. p. 230.)

(T. 247.)  In Nicely's opinion, Deputy McMurray should have followed Kira when she wanted to head towards Hill.  (T. pp. 248-250.)  Nicely also testified that Deputy McMurray was "cueing" Kira.  (T. p. 251-53.)  Mr. Nicely also criticized Kira  for being trained to do "article work" which is to search for things which have  human odor and also to search for narcotics.   However, Nicely testified that he does not know if Kira was ever, in fact, trained for "article work."  (T. pp. 260-261)  Mr. Nicely  also criticized  the training Kira received because there was no "real world" testing.  (T. pp. 279-280.)   Finally, Nicely was  of the opinion that the fact that cocaine was actually recovered from Deputy McMurray's patrol car did not indicate that Kira's alert was reliable.  (T. p. 323.)

## III.   Discussion

### A.   The Traffic Stop Did not Violate the Fourth Amendment

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend 4.  Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."  United States v. Calandra, 414

U.S. 338, 347, 94 S. Ct. 613, 619 (1974).

The temporary detention of an individual by a police officer during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  United States v. Vaughan, 700 F.3d 705, 709 (4th Cir. 2012); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011).  The decision to initiate a stop of an automobile is reasonable if the police officer has probable cause to believe that a traffic violation has occurred.  Digiovanni, 650 F.3d at 506.  "Any ulterior motive a police officer may have for making the traffic stop is irrelevant."  Id.

Courts employ the standard set forth by the United States Supreme Court in Terry v. Ohio, 292 U.S. 1, 88 S. Ct. 1868 (1968), to determine whether police conduct during routine traffic stops comports with the requirements of the Fourth Amendment.  Vaughan, 700 F.3d at 709; United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011).   As the United States Court of Appeals for the Fourth Circuit explained in Guijon-Ortiz:

> Under *Terry's* "dual inquiry," after asking whether the officer's action was "justified at its inception," *Rusher*, 966 F.2d at 875, we ask whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion).  With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*. With regard to duration, although the reasonable duration of a traffic stop "cannot be stated with mathematical precision," *United States v.*

*Branch*, 537 F.3d 328, 336 (4th Cir.2008), a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L.Ed.2d 842 (2005). Thus, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L.Ed.2d 605 (1985). To prolong a traffic stop "beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336. This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.*

Although the scope and duration components of *Terry's* second prong require highly fact-specific inquiries, the cases make possible some generalizations. When a police officer lawfully detains a vehicle, "police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir.2011). The officer may also, "in the interest of personal safety," request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure. *United States v. Soriano–Jarquin*, 492 F.3d 495, 500–01 (4th Cir. 2007). Similarly, the officer may "inquir[e] into matters unrelated to the justification for the traffic stop," *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L.Ed.2d 694 (2009), and may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle, *Caballes*, 543 U.S. at 409, 125 S. Ct. 834, but again only "so long as those inquiries [or other actions] do not measurably extend the duration of the stop." *Johnson*, 129 S. Ct. at 788.

660 F.3d at 764-65.

<u>1.</u>   <u>Deputy McMurray's action in stopping the Equinox was justified at its inception</u>

The question for the Court as to the first prong of the <u>Terry</u> analysis is whether the initial traffic stop was justified. <u>Digiovanni</u>, 650 F.3d at 506. A traffic stop is justified at its inception where an officer has probable cause or a reasonable suspicion to stop a vehicle. <u>United States v. Hassan El</u>, 5 F.3d 726, 730 (4th Cir. 1993). The test is an objective one. <u>Id.</u>; <u>United States v. Swann</u>, 149 F.3d 271, 275-76 (4th Cir. 1998). "[W]hen an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment." <u>Hassan El</u>, 5 F.3d at 730.

Here, Deputy McMurray's decision to initially stop the Equinox was substantially justified because he had probable cause to believe that a traffic violation had occurred. <u>See</u> <u>Digiovanni</u>, 650 F.3d at 506. Specifically, Deputy McMurray was justified in pulling Defendants over for following too closely in violation of North Carolina law. The North Carolina General Statute § 20-152 provides that:

**§ 20-152. Following too closely**.

(a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.
(b) The driver of any motor vehicle traveling upon a highway outside of a business or residential district and following another motor vehicle shall, whenever conditions permit, leave sufficient space so that an overtaking vehicle may enter and occupy such space without

danger, except that this shall not prevent a motor vehicle from
overtaking and passing another motor vehicle.  This provision shall
not apply to funeral processions.

Deputy McMurray saw the Equinox vehicle following another vehicle at a
distance of one car length while both vehicles were traveling at 60mph.  (T. p. 33.)
In Deputy McMurray's opinion the vehicles should have been at least six car
lengths or 120 feet apart because following too closely can result in serious vehicle
collisions and personal injuries.  (T. pp. 34-35, 37.)  Under the objective
circumstances, Deputy McMurray had a reasonable basis for stopping the Equinox.
See Digiovanni, 650 F.3d at 506; Hassan El, 5 F.3d at 731.

Defendants contention that the video demonstrates that Defendants were not
following too closely is without merit as the video did not begin recording until
after Deputy McMurray turned on this blue lights.   (T. pp. 37-40.)  Thus, at the
point where the video begins recording the traffic stop, Deputy McMurray had
already observed the traffic violation, and the Court finds Deputy McMurray's
testimony regarding his observations prior to initiating his blue lights credible.
Finally, the fact that Deputy McMurray only issued Dodwell a warning ticket does
not otherwise render the traffic stop unjustified under the Fourth Amendment.
Again, the objective circumstances provided Deputy McMurray a reasonable basis
for stopping the Equinox because the evidence demonstrates that  Deputy

McMurray  observed the Equinox commit a traffic violation – following too closely.  As a result of observing the traffic violation, Deputy McMurray had probable cause to stop the Equinox.  See Hassan El, F.3d at 730.  The fact Deputy McMurray may have had other motives for stopping the Equinox is irrelevant.  See Digiovanni, 650 F.3d at 506.

> ### 2. Deputy McMurray's subsequent actions were reasonably related in scope to the circumstances that justified the stop

Pursuant to Terry's second prong, the traffic stop must be limited in both scope and duration.  Digiovanni, 650 F.3d at 507.  "In the context of traffic stops, police diligence includes requesting a driver's license and vehicle registration, running a computer check, and issuing the ticket."  Id.; see also United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).  As part of conducting the tasks associated with a traffic stop, an officer may ask questions unrelated to the purpose of the stop so long as the questions do not extend the stop beyond the period reasonably necessary for the officer to effectuate the traffic stop.  Digiovanni, 650 F.3d at 507.  In addition, an officer may request that a driver and passenger exit the vehicle.  United States v. Vaughan, 700 F.3d 705, 710 (4th Cir. 2012).

The actions taken by Deputy McMurray in this case were sufficiently limited in scope and duration as to not measurably extend the duration of the stop beyond the limits of the Fourth Amendment.  Deputy McMurray went about the business

of effectuating the traffic stop promptly and efficiently.  After stopping the vehicle,

Deputy McMurray immediately approached the Equinox vehicle and talked to

Dodwell and Hill concerning the reasons for the stop.  (Gov.'s Ex. 5 at 1:46.)

Dodwell produced his driver's license while Hill had no identification documents

in his possession.   McMurray then asked Dodwell to come to the patrol car so that

Deputy McMurray could issue Dodwell a warning ticket.  (Gov.'s Ex. 5 at 3:15; T.

p. 45.)  From the time Dodwell entered the patrol car, Deputy McMurray engaged

Dodwell in a conversation while he worked on the onboard computer to process

the traffic stop.  (Gov.'s Ex. 5.)  The conversation spans approximately nine

minutes.  (Gov.'s Ex. 5.)  During the nine minute period, Deputy McMurray asked

Dodwell questions about the stop, as well as questions about where Dodwell and

Hill had been and where the two were going.  (Gov.'s Ex. 5.)

After approximately nine minutes, McMurray exited the patrol vehicle to

obtain information about the Equinox and identification from Hill.  (Gov.'s Ex. 5.)

McMurray returned to the patrol vehicle three minutes later, where he completes

the issuance of the warning ticket while engaging in further conversations with

Dodwell concerning Dodwell's trip to Atlanta. (Gov.'s Ex. 5.)  As the video

reflects, Deputy McMurray continuously worked on his computer while talking to

Dodwell until he hands Dodwell the warning ticket.  (Gov.'s Ex. 5 at 17:22.) The

questioning of Dodwell, therefore, did not unlawfully extend the stop because Deputy McMurray was continuously processing the stop while he was questioning Dodwell. Moreover, the entire process was completed in less than sixteen minutes and ends with Deputy McMurray handing Dodwell his paperwork and the warning ticket. At this point Dodwell was free to go, and the initial stop was complete. Upon a review of evidence in the record, the Court finds that the duration and scope of the stop up to the point where Deputy McMurray handed Dodwell the paperwork and warning ticket was sufficiently limited in scope and duration to effectuate the stop and did not run afoul of the Fourth Amendment; any delay caused by the additional questioning of Dodwell and Hill was *de minimis*. See United States v. Mason, 628 F.3d 123, 132 (4th Cir. 2010) (approving stop spanning eleven minutes); United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) (approving stop spanning fifteen minutes). In fact, the Fourth Circuit has approved significantly longer stops. See e.g., United States v. Mincey, 321 Fed. App'x 233, 240, 41-42 (4th Cir. 2008) (unpublished) (approving stop spanning thirty-five minutes); United States v. Jones, 289 Fed. App'x 593, 599-600 (4th Cir. 2008) (unpublished) (approving stop spanning twenty minutes). Even if the delay caused by the additional questioning of Defendants during the initial portion of the stop was more than a *de minimis* delay, such a delay was reasonable in this case based

on the contradictory information provided by the Defendants and the fact that neither Defendant owned the vehicle they were driving. See Digiovanni, 650 F.3d at 511 ("A routine traffic stop also can lengthen in time where the driver or one of the passengers provides inaccurate information."); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008).

Once Deputy McMurray handed Dodwell the ticket, however, he needed either the consent of Dodwell or reasonable suspicion to prolong the traffic stop to allow his investigation into a matter beyond the scope of the stop. Digiovanni, 650 F.3d at 507; Branch 537 F.3d at 336. Deputy McMurray had both in this case.

After handing Dodwell the ticket, Deputy McMurray asked Dodwell if he would consent to further questioning; Dodwell agreed to remain on the scene and continue answering Deputy McMurray's questions. (T. pp. 52, 129, 135; Def.'s Ex. 5 at 17:22.) The continued questioning and the extended nature of the stop was consensual and, thus, did not run afoul of the Fourth Amendment. See Digiovanni, 650 F.3d at 507; Branch 537 F.3d at 336.

Even had Dodwell not consented to the continued questioning, Deputy McMurray could have continued to detain Dodwell beyond the scope of the traffic stop based on his reasonable suspicion that illegal activity was afoot. See Digiovanni, 650 F.3d at 507; Branch 537 F.3d at 336. During the initial portion of

the traffic stop, Deputy McMurray learned that Defendants were returning from

Atlanta, an area which is known as a large source of drugs, in a vehicle owned by a

third party. In Deputy McMurray's experience, third party vehicles are often used

to transport drugs. See United States v. Vaughan, 700 F.3d 705, 711 (4th Cir.

2012) (explaining that officers may draw on their own experiences and make

inferences and deductions about all the information available and that courts may

credit the practical experience of officers); United States v. Mason, 628 F.3d 123,

129 (4th Cir. 2010) (fact that driver was coming from Atlanta on a known drug

route a factor giving rise to reasonable suspicion of criminal activity). Dodwell

also had a difficult time locating the paperwork for the vehicle. In addition,

Dodwell provided conflicting stories about where he had stayed in Atlanta, and

Dodwell and Hill gave conflicting stories about what they did while in Atlanta.

See Mason, 628 F.3d at 129 (conflicting stories regarding the purpose of travel and

where the defendants had stayed a factor giving rise to reasonable suspicion of

criminal activity). The Defendants had also only been in Atlanta for a short period

of time despite the relatively long distance between Atlanta and Johnson City,

Tennessee. Dodwell also appeared nervous and was vague when answering

Deputy McMurray's questions. See Illinois v. Wardlow, 528 U.S. 119, 124

(2000) ("nervous, evasive behavior is a pertinent factor in determining reasonable

suspicion."); <u>Vaughan</u>, 700 F.3d at 711.  Finally, Dodwell had a prior conviction for possession of crack cocaine and had served an active sentence of eight months; Hill had also been arrested on drug charges.

When taken as a whole, these facts provided Deputy McMurray with sufficient facts to give an experienced officer like Deputy McMurray a reasonable suspicion that Defendants were engaged in criminal activity.  <u>See</u> <u>Mason</u>, 628 F.3d at 129.   Because Deputy McMurray had a particularized and objective basis for suspecting legal wrongdoing, Deputy McMurray could extend the stop for a period of time reasonably necessary to confirm or dispel his suspicions of criminal activity.  <u>See</u> <u>Vaughan</u>, 700 F.3d at 710-11.  Thus, the decision to extend the traffic stop after giving Dodwell the ticket, did not violate the Fourth Amendment.

### B.  The Search of the Vehicle did not Violate the Fourth Amendment

The Fourth Amendment protects individuals from unreasonable searches. U.S. Conts. amend. IV.   A search by an officer is unreasonable where "it infringes on an expectation of privacy that society is prepared to consider reasonable." <u>United States v. Castellanos</u>, 716 F.3d 828, 832 (4th Cir. 2013) (internal quotations and citation omitted).  As the Fourth Circuit explained in <u>Castellanos</u>:

> "In order to demonstrate a legitimate expectation of privacy, [Castellanos] must have a subjective expectation of privacy," <u>United States v. Bynum</u>, 604 F.3d 161, 164 (4th Cir.2010), and that subjective expectation of privacy must be "objectively reasonable; in

> other words, it must be an expectation that society is willing to recognize as reasonable," United States v. Bullard, 645 F.3d 237, 242 (4th Cir.2011) (internal quotation marks omitted). The burden of showing a legitimate expectation of privacy in the area searched rests with the defendant. Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

716 F.3d at 832. In some circumstances, parties other than the actual owners of a vehicle may have a reasonable expectation of privacy in the contents of the vehicle. Id. The vehicle in this case was owned by the sister or girlfriend of Hill. Dodwell was driving the vehicle. Defendants did not introduce any evidence demonstrating that each of the Defendants possessed a reasonable expectation of privacy in the contents of the Equinox, which they did not own. Absent an expectation of privacy in the vehicle, Defendants cannot challenge the warrantless search of the Equinox. Despite the Court's concerns regarding whether each of the Defendants has a reasonable expectation of privacy to the contents of the Equinox, the Court will assume for purposes of ruling on the Motion to Suppress that Defendants demonstrated by a preponderance of the evidence that at the time of the search, each Defendant had a legitimate expectation of privacy in the Equinox. See id.

The positive alert from a dog trained to detect narcotics can provide officers with probable cause to believe that narcotics are present in a vehicle and to allow

for the warrantless search of a vehicle. Mason, 628 F.3d at 130; Branch, 537 F.3d at 340, n.2. Here, Kira alerted to the presence of narcotics in the Equinox. Ordinarily, such an alert would provide the officers with probable cause to search the vehicle. Defendants, however, contend that the alert was not reliable in this case. Specifically, Defendants contend that Kira's training was insufficient, and that Deputy McMurray cued Kira to alert in this case.

In Florida v. Harris, the United States Supreme Court recently addressed how Courts are to handle the probable cause determination based on a dog alert. In Harris, the Supreme Court explained:

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.
>
> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those

settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant . . . . And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the [Government's] case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. . . . The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

133 S. Ct. at 1057-58.

Viewed in the context of all the facts surrounding Kira's alert, the Court finds that a reasonably prudent person would believe that a search of the Equinox would reveal contraband. Kira and Deputy McMurray received certifications from the North American Police Work Dog Association in September 2010 (Gov.'s Ex. 1), and they received renewals of their certification in 2011 and 2012 (Gov.'s Ex. 2; Gov.'s Ex. 3). The training records also show regular training of Kira each

month until February of 2012.  In addition, Kira's deployment records reflect that she is an experienced and generally reliable drug detection dog.  The fact that narcotics were not found during the deployments of September 22, 2010, October 1, 2010, and October 4, 2010, is not remarkable because there are indications that Kira may have smelled the residual odors of drugs previously in the vehicle. Based upon the Court's review of all the evidence in the record, the Court finds that Kira is a reliable drug detection dog, and her alert could provide probable cause to search a vehicle for narcotics.   To the extent that Nicely testified that Kira's training was generally  improper or insufficient, the Court finds his testimony to be of little weight as it was contradictory to the training records and certification documents in the record and based largely on his recommended training methods, which even he acknowledges are  not the generally accepted methods for training and certifying drug dogs.   (See e.g., T. pp. 297-98.)

In addition to finding that Kira is generally reliable, the Court also finds that the alert that occurred on May 2, 2012, was reliable and provided probable cause to search the vehicle.  As a threshold matter, the Court finds the fact that Kira missed three months of monthly training prior to her deployment in this case as a result of Deputy McMurray's surgery does not render the alert to the Equinox unreliable. Although Nicely testified regarding the fact that Kira did not receive the training

during this time period, as mandated by the Henderson County Sheriff's Department, Nicely was not asked what affect this failure to train would have had upon Kira's reliability on May 2, 2102. (T. pp. 283, 365-66.) Deputy McMurray, however, specifically testified that a very seasoned dog such as Kira does not need as much training. (T. pp. 120-21.) Finally, the Court finds Nicely's testimony that Deputy McMurray cued Kira in this case to be unsupported by the record and generally unreliable. Put simply, the evidence does not support a finding that Deputy McMurray cued Kira on May 2, 2012.

Based upon an evaluation of all of the evidence in the record, the circumstances surrounding the dog alert, and weighing the competing evidence, the Court finds that the alert of Kira would cause a reasonably prudent person to think a search of the Equinox would reveal contraband. Deputy McMurray had probable cause to conduct a search of the Equinox vehicle. Accordingly, the Court finds that the warrantless search of the Equinox did not violate the Fourth Amendment.

### C. The statements made by Dodwell and Hill during the traffic stop are admissible

The routine questioning of a motorist detained pursuant to a routine traffic stop does not trigger the safeguards prescribed by Miranda because individuals temporarily detained during a traffic stop are not in custody for purposes of Miranda. Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984); United States v.

Jackson, 280 F.3d 403, 405 (4th Cir. 2002).   The initial questioning of Defendants

occurred as part of a routine traffic stop; neither Defendant Dodwell nor Hill were

in custody for purposes of Miranda at the time.   Defendants' freedom of

movement was not curtailed to a degree associated with formal arrest.   See

Berkemer, 468 U.S. at 440.   Moreover, once officers placed handcuffs on

Defendants and the nature of the traffic stop changed, Detective Westphal advised

Defendants of their Miranda rights prior to questioning Defendants.[4]   (T. pp. 205-

206, 212.)   Accordingly, the Court finds that any statements made by Defendants

prior to being advised of their Miranda rights are admissible.

## IV.    Conclusion

The Court **RECOMMENDS** that the District Court **DENY** the Motions to

Suppress (# 18, # 19 & # 33).

Signed: January 17, 2014



Dennis L. Howell
United States Magistrate Judge

---

4   The Court will assume for purposes of ruling on this motion that Defendants were in custody for purposes of
Miranda at the point where Defendants were placed in handcuffs and their freedom of movement was restricted
beyond that typical of a traffic stop.

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(c), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).