# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CASE NO. 1:12-CR-93-MR-DLH

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | **MEMORANDUM** |
| ) | **OPINION AND ORDER** |
| LLOYD DODWELL and ) | |
| DARREN HILL. ) | |
| _____) | |

**THIS MATTER** is before the Court for resolution of the Defendants' Motions to Suppress [Docs. 18; 33], and the Defendants' Objections [Docs. 91; 94] to the Magistrate Judge's Memorandum and Recommendation ("M&R") [Doc. 82]. For the reasons that follow, this Court will accept the Magistrate Judge's recommendations and will deny the Defendants' suppression motions in full.

## PROCEDURAL BACKGROUND

On October 2, 2012, the Defendants Lloyd Dodwell ("Dodwell") and Darren Hill ("Hill") were named in a Bill of Indictment and charged with possessing with the intent to distribute at least 500 grams of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). [Doc. 1]. The grand jury also found probable cause to believe that $30,504 in

United States currency was subject to forfeiture pursuant to 21 U.S.C. § 853. [Id.].

On January 24, 2013, Hill filed a motion to suppress [Doc. 18], amending it with a supplemental filing the following day. [Doc. 19]. On February 15, 2013, Dodwell filed a motion to suppress. [Doc. 33]. The Magistrate Judge joined for hearing the Defendants' suppression motions and took evidence and testimony over the course of two days beginning August 1, 2013. On January 17, 2014, Magistrate Judge Howell issued his M&R. [Doc. 82]. He recommended that the Court deny the Defendants' suppression motions. [Id. at 41]. The Magistrate Judge informed the parties they could file any objections to his M&R within fourteen days' of service thereof. [Id. at 42]. Dodwell filed his objections on February 21, 2014, [Doc. 91] and Hill filed his objections March 7, 2014. [Doc. 94].

The Defendants' Motions to Suppress and Objections to the M&R are now ripe for the Court's consideration.

## STANDARD OF REVIEW

Since the Defendants have raised various objections to the Magistrate Judge's Memorandum and Recommendation, the Court will review the Magistrate Judge's proposed findings and conclusions de novo. 28 U.S.C. § 636(b)(1); Fed.R.Crim.P. 59(b)(3).

## FACTUAL SUMMARY

The detailed factual background of this case is straight forward and is set forth in the M&R. Therefore, it will not be reproduced here. The undisputed, salient facts are as follows. On May 2, 2012, at approximately 6:40 p.m., Henderson County Deputy David McMurray was on patrol in an unmarked vehicle traveling west on Interstate 26 between Hendersonville and Asheville. [T. at 32]. Prior to his employment with the Henderson County's Sheriff's Office, Deputy McMurray was a trooper and canine handler with the North Carolina Highway Patrol for approximately nine years. [T. at 9-12]. While observing traffic on I-26, Deputy McMurray noticed two vehicles traveling within a car length of distance between them. [T. at 33]. The vehicles were each traveling at a speed of approximately 60 mph. [T. at 33]. In the opinion of Deputy McMurray, the second vehicle was following the first vehicle too closely, and thus, violating North Carolina law. [T. at 34-35]. Accordingly, Deputy McMurray activated his blue lights in order to stop the second vehicle, a Chevrolet Equinox SUV. [T. at 38]. At the time, Deputy McMurray had with him his drug detection dog, Kira, a Belgium Malinois. [T. at 12-13].

When Deputy McMurray activated his blue lights, the audio and video equipment in his patrol car automatically engaged. [T. at 38; 135-136]. The

video equipment is designed to record onto media a split-screen view of events. The top half of the screen shows a view over the hood of the patrol vehicle looking forward through the windshield. The bottom half of the screen shows a view into the interior of the patrol car of the driver seat, the front passenger seat, and Kira's kennel located behind the front passenger seat. [T. at 39; 135-136]. Deputy McMurray wears a body microphone that automatically records sounds transmitted in his presence outside of the patrol vehicle. A microphone on the inside of the patrol vehicle, located in the driver's side door, records sounds transmitted within. [T. at 38-40; 83; 135-137]. Using these recording devices, Deputy McMurray attempted to record both video and audio of the stop, as well as the resulting investigation. [T. at 40-41].

When the SUV stopped, Deputy McMurray approached the vehicle from the passenger's side. Defendant Dodwell was sitting in the driver's seat of the Equinox and Defendant Hill was sitting in the front passenger seat. [T. at 44]. Deputy McMurray told Dodwell that he had stopped Dodwell because he was right on top of the vehicle he was following. In response, Dodwell admitted that he was following the vehicle too closely and explained that the vehicle he was following had been braking. [T. at 46; GX5[1] at 00:01:46].

---

[1] At the suppression hearing held before the Magistrate Judge, the Government

Deputy McMurray then asked Dodwell to exit the Equinox and follow him back to his patrol car so that he could issue Dodwell a warning ticket. [T. at 45; GX5 at 00:03:15]. Before leaving the passenger's side of the SUV, McMurray asked Hill for a driver's license or some form of identification. Hill responded that he had no identification with him. [GX5 at 00:03:25].

After Deputy McMurray and Dodwell entered McMurray's patrol car, McMurray accessed his police computer and began the process of verifying Dodwell's documentation in order to issue him a warning ticket. While Deputy McMurray was entering data and then waiting for his computer to respond, he asked Dodwell a number of questions, some pertaining to the vehicle stop and others having no bearing on the stop. [GX5 at 00:04:10 to 00:13:37]. During this approximate nine minutes of conversing, Deputy McMurray became suspicions of a number of Dodwell's answers, and further, learned from Dodwell that both Dodwell and Hill had previously been arrested for drugs. [GX5 at 00:12:20]. Deputy McMurray attempted to run a records check on Hill but was unsuccessful without some form of identification from Hill or his date of birth. Deputy McMurray then exited his

---

introduced, as Government's Exhibit 5, a copy of the DVD recording made by Deputy McMurray's audio and video equipment of the traffic stop. Specific citations to portions of this DVD recording will be noted as "[GX5 at XX:YY:ZZ]" where "XX" refers to the hours, "YY" refers to the minutes, and "ZZ" refers to the seconds of the DVD timestamp.

patrol car telling Dodwell he was going to ask Hill his birthdate, obtain the vehicle identification number of the SUV, and return the SUV's registration material to Hill. [GX5 at 00:13:37].

After leaving his car, Deputy McMurray approached the SUV and then spoke with Hill. Hill made several statements to Deputy McMurray that conflicted with statements Dodwell made to Deputy McMurray. Approximately two minutes after approaching Hill, Deputy McMurray finished speaking with him and returned to the patrol car and began entering data into the police computer. [GX5 at 00:15:25]. Deputy McMurray did not obtain the VIN from the SUV testifying that he did not want to be distracted from the discrepancies between the statements of Hill and Dodwell. [T. at 91]. While entering data and waiting for his computer to respond, Deputy McMurray continued to speak with Dodwell growing more suspicious as some of Dodwell's answers refuted information that Hill had just provided to McMurray. [Doc. 82 at 15-16]. Two minutes after Deputy McMurray returned to his patrol car, his police computer printed out Dodwell's warning citation. [GX5 at 00:17:25]. Deputy McMurray returned Dodwell's license to him and gave him the warning ticket. Dodwell thanked Deputy McMurray and shook his hand. [GX5 at 00:17:53]. Before Dodwell opened the patrol car door to leave, Deputy McMurray asked Dodwell, "do you mind talking to me for just

a minute?" [GX5 at 00:17:57]. Dodwell then agreed to speak further with Deputy McMurray. [GX5 at 00:17:58].

Deputy McMurray's subsequent conversations with both Dodwell and Hill[2] led McMurray to direct Hill to step out of and away from the SUV. [Doc. 82 at 17]. Deputy McMurray radioed for back up assistance and then deployed Kira, his drug detection dog, to sniff around the SUV. [Id. at 17-18]. On three occasions, while Deputy McMurray and Kira were circling the SUV, Kira pulled Deputy McMurray in the direction of Hill's path that led away from the SUV. [GX5 at 00:35:12 to 00:35:50]. Kira alerted to the SUV by jumping through the open passenger's side window. [GX5 at 00:36:26].

A search of the SUV revealed bundles of United States currency totaling in excess of $30,000. [T. at 66]. At various times during the search of the SUV, Dodwell and Hill were placed in Deputy McMurray's patrol car, sometime together sometimes individually, as law enforcement officers continued searching the SUV. On one occasion when Hill was alone in the front passenger's seat of Deputy McMurray's vehicle, he withdrew a plastic bag containing a white substance from his pants and dropped it behind the

---

[2] Like Dodwell, Hill consented to speak further with Deputy McMurray. [T. at 54].

7

driver's seat of the patrol car without anyone noticing.³ [GX5 at 01:26:38 to 01:29:38]. The officers on scene, oblivious to Hill's discarding of his wares in the patrol car, and unsuccessful in finding contraband in the SUV, released Dodwell and Hill to continue their travels. [T. at 73]. Ten days later, while Deputy McMurray was reviewing the audio and video recording of Dodwell's traffic stop, he saw Hill deposit a bag behind the patrol car driver's seat. Deputy McMurray then went to his vehicle and discovered the plastic bag containing a white substance behind his driver's seat. [T. at 77; 167]. This plastic bag contained cocaine hydrochloride. [T. at 215].

## FACTUAL OBJECTIONS

Defendant Dodwell made no factual objections to the Magistrate Judge's comprehensive factual recitation contained in the M&R. Defendant Hill objected only to two alleged discrepancies in the M&R. First, he asserts that Magistrate Judge Howell erred in finding "that Kira headed in the defendant's direction and turned in the direction that the defendant had previously walked." [Doc. 94 at 3 n.2]. The Court has reviewed the DVD introduced as Government's Exhibit 5 and agrees with the Magistrate Judge's findings. As disclosed on the video at the timestamp period of

---

³ Hill was able to accomplish this feat while his hands were cuffed behind him.

00:35:12 to 00:35:50, Kira turned and headed in the direction Hill previously had walked, not once but *three times*. The Court, therefore rejects Hill's first factual objection. Second, Hill objects to the Magistrate Judge's findings "that Kira whined and paced and stared at the defendant while in the patrol car when the defendant <u>was sitting in front of her</u> with cocaine." [Doc. 94 at 3 n.2 (emphasis added)]. Hill, however, has misread the M&R. Magistrate Judge Howell found that Kira whined and paced in her kennel when Hill <u>was sitting next to her</u> in the back seat of the patrol car, not when Hill was seated in front of Kira. [Doc. 82 at 19-20]. The video clearly shows Kira pacing at timestamp period 00:49:57 to 00:50:01 while Hill was seated beside her. Further, with Hill seated next to her, Kira distinctly whines at time stamp 01:00:29. The Court, therefore rejects Hill's second factual objection. Notwithstanding the Court's rejection of Hill's factual objections, Hill's alleged factual discrepancies, even if accepted, would have no effect upon the legal determinations at issue in this case. Consequently, the Court will adopt in full the Magistrate Judge's factual findings as set forth in his M&R.

## DISCUSSION

Both Defendants assert, as their only legal objection to the M&R, that the Magistrate Judge erred in concluding that the traffic stop initiated by Deputy McMurray complied with the Fourth Amendment. "[Dodwell]

contends the actions taken by Deputy McMurray in this case were not sufficiently limited in scope and duration and measurably extended the duration of the stop beyond the limits of the Fourth Amendment." [Doc. 91 at 2]. "[Hill] objects to the conclusion of law that the traffic stop did not violate the 4th Amendment." [Doc. 94 at 1]. Like the detail Magistrate Judge Howell set out in his factual recitation contained in the M&R, his analysis of the legal issues surrounding the stop of the Chevrolet Equinox SUV driven by Dodwell on May 2, 2012, requires little elaboration from the Court.

> The Fourth Amendment to the United States Constitution provides:
>
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV. Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974). The temporary detention of an individual by a police officer during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). The decision to initiate the stop of an automobile is reasonable if a

police officer has probable cause to believe that a traffic violation has occurred. Digiovanni, 650 F.3d at 506.

Once a vehicle is stopped and its occupants seized, courts employ the standard set forth by the Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968), to determine whether police conduct during a routine traffic stop comports with the requirements of the Fourth Amendment. United States v. Vaughan, 700 F.3d 705, 709 (4th Cir. 2012); United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011). "This approach presents us with a dual inquiry: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) (citing Terry, 392 U.S. at 20). Further, the second prong of Terry's dual inquiry has been expanded, requiring courts to evaluate the component of duration in addition to the component of scope. A stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005).

Beginning with the first prong of Terry's dual inquiry, there is no question that the initial stop of the Equinox was reasonable. Deputy McMurray had probable cause to believe that Dodwell committed a traffic violation by following a vehicle too closely. In fact, Dodwell admitted to

11

Deputy McMurray that he was following the vehicle in front of him too closely. [GX5 at 00:01:46]. Hill, however, argues "that the decision to stop the vehicle was pretextual and unreasonable." [Doc. 94 at 1]. The fact that Deputy McMurray may have had other motives for stopping the SUV, however, is of no moment. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Any ulterior motive a police officer may have for making the traffic stop is irrelevant. Id. at 813. Deputy McMurray's stop of the SUV, therefore, was justified at its inception. Accordingly, the determinative question before the Court arises under Terry's second prong: whether the actions taken by Deputy McMurray after the initial stop complied in length and breadth with the requirements of the Fourth Amendment.

Both Defendants contend that, after stopping the Equinox, Deputy McMurray's actions were not "sufficiently limited in scope and duration" [Doc. 91 at 2], or were not "reasonably related in scope and duration" [Doc. 94 at 2] to the circumstances justifying the stop. The Defendants draw their argument from the Supreme Court's plurality opinion in Florida v. Royer, 460 U.S. 491 (1983). There, the Court explained the duration component of a Terry stop is analyzed on the basis of "whether the police diligently pursued

a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." <u>Royer</u>, 460 U.S. at 500. With regard to the scope of any detention permitted by <u>Terry</u>, the Court cautioned that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." <u>Id.</u>

<u>Royer</u>, however, was not a traffic stop case. This fact is significant as it pertains to the scope component. In the context of a traffic stop, the driver and passengers are necessarily detained for the resolution of (i.e. the scope of) the alleged motor vehicle violation. Put another way, seizing and detaining a motorist by pulling him over is the *only* investigative method available to verify or dispel an officer's suspicion that a traffic violation has occurred. The scope of a traffic stop, therefore, is constrained by the investigation of the nature of the alleged motor vehicle violation and performing those activities appurtenant to the issuance of citation. <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009) (A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation, continues and remains reasonable for the duration of the stop, and ends when the police have no further need to control the scene). <u>See</u> <u>also</u>, <u>Digiovanni</u>, 650 F.3d

at 507 (police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket).

While the scope of a traffic stop demands the officer's efficient pursuit of the alleged motor vehicle violation, the Supreme Court has interpreted the Fourth Amendment's seizure provision to permit as reasonable certain actions taken by an officer during a stop. For example, in Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977), the Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." In Maryland v. Wilson, 519 U.S. 408, 415 (1997), the Court held the Mimms rule applied to passengers as well as to drivers. The Fourth Circuit has held that an officer may also, "in the interest of personal safety," request that the passengers in the vehicle provide identification for criminal record checks, at least so long as the request does not prolong the seizure. United States v. Soriano–Jarquin, 492 F.3d 495, 500–01 (4th Cir. 2007). Finally, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop," the Supreme Court has made plain, "do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Johnson, 555 U.S. at 333. To expand the

14

investigation of a motorist "beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." Id.

The duration component of Terry's "dual inquiry" second prong, while conceptually easier to grasp, remains as highly fact-bound in its application as the component of scope.

> With regard to duration, although the reasonable duration of a traffic stop "cannot be stated with mathematical precision," United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008), a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L.Ed.2d 842 (2005). Thus, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L.Ed.2d 605 (1985).

Guijon-Ortiz, 660 F.3d at 764-65.

The foregoing precedent establishes that the scope component of a traffic stop is inextricably intertwined with the duration component and can be violated by an officer who either abandons the prosecution of the traffic violation by embarking upon a different sustained course of investigation, or engages in a blended process of conducting a routine traffic stop and some

15

other investigation and devotes an unreasonable amount of time to the latter. See, e.g., United States v. Peralez, 526 F.3d 1115, 1121 (8th Cir. 2008) (defendant's Fourth Amendment rights were violated where police officer engaged in a "blended process" of conducting a routine traffic stop and a drug investigation when officer's "off-topic questions" more than doubled the time the defendant was detained and constituted the bulk of the interaction between the officer and the van's occupants).

In this matter, the traffic stop began when Deputy McMurray pulled over the Equinox. Digiovanni, 650 F.3d at 506. Deputy McMurray requested identification from Dodwell the driver and Hill the passenger, as well as the car's registration. Dodwell provided his license. Hill stated he did not possess any form of identification and either he or Dodwell handed McMurray the registration material for the SUV. McMurray then asked Dodwell to accompany him and the two men promptly returned to the patrol car. Deputy McMurray's request in this regard was fully in accord with the Supreme Court's Mimms decision.

Inside the car, McMurray began entering data into his computer to run a check on the vehicle and a check the license of Dodwell as he was entitled to do as part of the traffic stop. Vaughan, 700 F.3d at 710. In the course of doing so, McMurray struck up a conversation with Dodwell concerning

Dodwell's travel plans and his previous days' activities. While Deputy McMurray was permitted to ask Dodwell "off topic" questions, Johnson, 555 U.S. at 333, Dodwell was under no obligation to respond to them. Dodwell could have politely declined to respond to any of Deputy McMurray's inquiries beyond those necessary for the completion of the warning ticket. The conversation between Dodwell and Deputy McMurray occurred simultaneously with Deputy McMurray's computer check of the SUV's registration and of Dodwell's license. When Dodwell told Deputy McMurray both he and Hill had prior drug arrests, Deputy McMurray clearly was entitled to run a record check for outstanding arrest warrants on both Defendants as part of the traffic stop. Vaughan, 700 F.3d at 710; Soriano-Jarquin, 492 F.3d at 500. Hill asserts that it was unreasonable Deputy McMurray's return to the SUV to speak with him "concerning completely irrelevant subject matter." [Doc. 94 at 2]. Even though Deputy McMurray spent the better part of the two-minute conversation with Hill covering "off topic" issues, one of Deputy McMurray's legitimate purposes in returning to the SUV was to obtain Hill's birthdate in order to run a criminal record check. Obtaining the information by this method was necessitated by Hill's having been unable to produce identification in the first instance. The short period of time Deputy McMurray spent with Hill beyond that necessary to obtain his birthdate was de minimis

and reasonable considering the conflicting stories given by Dodwell and Hill. When Deputy McMurray returned to his patrol car with Hill's birthdate, he immediately entered the data Hill provided and thereafter the computer check of both Defendants was complete. Deputy McMurray's computer then printed out a warning ticket which he handed to Dodwell together with Dodwell's license. Dodwell shook Deputy McMurray's hand, and with that, the routine traffic stop came to an end. Unlike the officer in Digiovanni, Deputy McMurray did not abandon the prosecution of the traffic offense and pursue a drug investigation in lieu thereof. Even though Deputy McMurray engaged in a blended process of questioning Dodwell in a manner somewhat similar to the officer in Peralez, his doing so did not appreciably extend the traffic stop; it certainly did not extend the traffic stop in any unreasonable way. The Magistrate Judge's conclusion that Deputy McMurray complied with the tenets of the Fourth Amendment in conducting the traffic stop of the Equinox driven by Dodwell was correct.

To detain the Defendants beyond the termination of the stop, Deputy McMurray needed either the permission of the Defendants or reasonable suspicion of illegal activity. Digiovanni, 650 F.3d at 507; United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). Here, Deputy McMurray had both. Neither

Defendant objects to the Magistrate Judge's legal analysis contained in the M&R concerning the events following the conclusion of the traffic stop. After careful consideration of the Magistrate Judge's M&R, the Court finds that the Magistrate Judge's proposed findings of fact are correct and that his proposed conclusions of law are consistent with current case law.

## CONCLUSION

Based upon the Court's <u>de novo</u> review of this matter, and for the reasons stated, the Court determines that Magistrate Judge Howell's proposed findings and conclusions are accepted as set forth herein by the Court. The Court accepts the Magistrate Judge's conclusions with regard to the seizure of the Defendants and the search of the Chevrolet Equinox SUV and denies their request to suppress the drugs discarded by Defendant Hill in the patrol car later found by Deputy McMurray.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Objections [Docs. 91; 94] to the Magistrate Judge's M&R [Doc. 82] are **OVERRULED.**

**IT IS FURTHER ORDERED** that the Defendants' Motions to Suppress [Docs. 18; 33] are **DENIED.**

**IT IS SO ORDERED.**

Signed: April 21, 2014

Martin Reidinger
United States District Judge